# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES FOR THE USE AND BENEFIT OF: TERRY RICHARDSON, individual D/B/A TERRY RICHARDSON CONCRETE, LLC, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:12-cv-00109 |
| v. | ) ) | Judge Sharp |
| | ) | Magistrate Judge Holmes |
| MACK MECHANICAL, INC., and AMERICAN SAFETY CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Defendants. | | |

## MEMORANDUM

Pending before the Court is the issue of damages in regards to Plaintiff Terry Richardson d/b/a Terry Richardson Concrete, LLC's ("Richardson") claim for payment under a Miller Act bond pursuant to 40 U.S.C. § 3133(b) against both Defendant Mack Mechanical ("Mack") and Defendant American Safety Casualty Insurance Company ("American Safety"). In an October 21, 2016 Order ("October 21 Order"), the Court granted summary judgment to Plaintiff Richardson on his Miller Act claim. (Docket No. 147). On March 20, 2017 and March 21, 2017, the Court held a hearing to decide if Plaintiff Richardson is entitled to damages. For the reasons set forth below, the Court will award Plaintiff Richardson $39,489.12 in damages.

## BACKGROUND

In its October 21 Order, the Court provided the general background to this litigation. (Docket No. 147). In order to frame the issue of damages, the Court briefly summarizes the main facts and parties' positions.

1

After Defendant Mack contracted with the United States Army Corps of Engineers ("the Corps") to be the prime contractor in the construction of a reinforced bunker at Range 38 in Ft. Leonard Wood, Missouri, Plaintiff Richardson entered into a turnkey subcontract with Defendant Mack to perform the concrete construction. Defendant American Safety posted a payment bond for Defendant Mack on the construction project. At the end of the construction project, the Corps accepted the work on the reinforced bunker and fully paid Defendant Mack under the prime contract. Nevertheless, Defendant Mack did not pay Plaintiff Richardson the full amount under the subcontract, and Plaintiff Richardson's claim for payment for work performed under the subcontract was unpaid.

In defending itself at the summary judgment stage, Defendant Mack conceded that the work Plaintiff Richardson performed was part of a federal contract for the construction of a public work; that Defendants Mack and American Safety executed a bond to ensure payment; and that Plaintiff Richardson remained unpaid. However, Defendant Mack argued that Plaintiff Richardson breached the subcontract in such a way to bar recovery of damages under the subcontract and payment under the bond. Plaintiff Richardson disagreed.

## ANALYSIS

### I. Threshold Issues

In order to determine the amount of damages Plaintiff Richardson may recover under the subcontract, the Court must first address threshold issues. Those issues are the agreed upon date of completion for the concrete work, the provisions of the prime contract incorporated into the subcontract, and whether Plaintiff Richardson materially breached the subcontract. The Court addresses each of them in turn.

**A. Parties agreed to a February 17, 2012 completion date for the concrete work**

As an initial matter, this suit is before the Court under the Miller Act and, thus, pursuant to federal question jurisdiction. However, in addressing matters related to the subcontract executed between Plaintiff Richardson and Defendant Mack, the Court will apply state law. See United States use of Kasler Electric Co. v. Insurance Co. of North America, 1992 U.S. App. LEXIS 13286, *9 (6th Cir. May 28, 1992) (citation omitted) ("'[S]tate law controls the interpretation of Miller Act subcontracts to which the United States is not a party.'"). While Plaintiff Richardson contends that Missouri law applies, Defendant Mack argues that Tennessee law applies. Because application of either yields the same outcome, the Court need not definitively decide which state law applies and analyzes the issues under both Missouri and Tennessee law.

Plaintiff Richardson argues that he and Defendant Mack never agreed on a date for completion of the concrete work under the subcontract. It is undisputed that when Plaintiff Richardson received the subcontract Defendant Mack had prepared, he signed it on December 23, 2011 on the understanding that Defendant Mack would not hold him to the January 5, 2012 completion date initially stated in the subcontract. The subcontract Plaintiff Richardson returned to Defendant Mack contained a handwritten notation to that effect. Plaintiff Richardson acknowledges that the subcontract he later received back from Defendant Mack contained a notation written and initialed by Amanda Brantley ("Brantley"), Chief Financial Officer of Defendant Mack, stating that the revised completion date would be February 17, 2012. However, Plaintiff Richardson argues that there is ambiguity regarding that date because he did not agree to it, the revised completion date does not contain his initials, and the conduct of the parties does not suggest agreement.

Based on testimony given at the damages hearing, February 17, 2012 was the date on which Plaintiff Richardson was to complete the concrete work because the Court finds that Plaintiff Richardson and Defendant Mack mutually assented to that date.  See Doe v. HCA Health Servs. of Tennessee, Inc., 46 S.W.3d 191, 196 (Tenn. 2001) (internal quotation marks and citations omitted) ("A contract must result from a meeting of the minds of the parties in mutual assent to the terms . . . to be enforced."); Don King Equip. Co. v. Double D Tractor Parts, Inc., 115 S.W.3d 363, 368 (Mo. Ct. App. 2003) (internal quotation marks and citation omitted) ("A meeting of the minds, or mutual assent of all parties is essential to the formation of a contract."). Plaintiff Richardson testified at the damages hearing that he did not propose the February 17, 2012 date to Defendant Mack and that he was not concerned with the February 17, 2012 date being a hard deadline because he never received a schedule informing him of the completion date.  (Mar. 20 Rough Transcript ("RT") 39, 48-49).  He also testified that it was his understanding that the completion date set out in the schedule change that Defendant Mack and the Corps executed on January 10, 2012 ("January 10 schedule change") would be the controlling date.  (Mar. 20 RT 41-42).

However, Arthur Ferraro ("Ferraro"), Defendant Mack's Project Manager on the construction of the reinforced bunker, and Brantley offered contradictory testimony.  Ferraro testified that after Defendant Mack received the signed contract back from Plaintiff Richardson, he, Brantley, and Plaintiff Richardson had a telephone conference to discuss the completion date for the concrete work.  (Mar. 20 RT 137-138).  Ferraro testified that, on that call, Plaintiff Richardson both indicated the number of weeks he thought he would need to complete the job and offered February 17, 2012 as the completion date.  (Mar. 20 RT 138-139).  Brantley testified that she, Ferraro, and Plaintiff Richardson "jointly arrived" at the February 17, 2012 completion

date, having discussed it on the call. (Mar. 21 RT 33). She further testified that when she wrote February 17, 2012 into the contract, she was only confirming a date to which the parties had already verbally agreed. (Mar. 21 RT 33). Brantley also repeatedly testified that the Corps did not extend the period of performance for Defendant Mack, which would have required a formal modification to the contract, but simply allowed Defendant Mack to continue to work based on the revised January 10 schedule change while paying liquidated damages to the Corps. (Mar. 21 RT 63, 69-70). Accordingly, she testified that the schedule change did not extend Plaintiff Richardson's performance time. (Mar. 21 RT 69-70).

Because Brantley and Ferraro were more credible than Plaintiff Richardson, the Court finds that Plaintiff Richardson and Defendant Mack mutually assented to the February 17, 2012 completion date. That is to say, the Court believes Brantley's and Ferraro's testimony that they had discussed and agreed upon the February 17, 2012 date with Plaintiff Richardson. The Court finds it significant that Plaintiff Richardson, per his testimony, never objected to the February 17, 2012 date as he had to the January 5, 2012 date. (Mar. 20 RT 63, 92). Furthermore, Plaintiff Richardson testified that he understood February 17, 2012 to be the date by which Defendant Mack wanted him to complete the concrete work. (Mar. 20 RT 90). He testified that although his subcontract with Defendant Mack was for that date, February 17, 2012 had no meaning if Defendant Mack had a different arrangement with the Corps. (Mar. 20 RT 94). That date did have meaning, and Plaintiff Richardson agreed to it.

**B. Provisions of the prime contract are incorporated into the subcontract**

The parties also disagree over whether portions of Defendant Mack's contract with the Corps were incorporated into the subcontract between Defendant Mack and Plaintiff Richardson and, if so, their implications. Section VII of the subcontract states, in pertinent part, that:

> If the Subcontractor persistently or repeatedly fails to carry out the work in accordance with the subcontract documents, including specification and drawings, the Contractor may elect to send a cure notice. If the Subcontractor fails to correct such deficiencies within the time period outlined in the cure notice, the Contractor may make good such deficiencies and deduct the reasonable cost thereof from payments then or thereafter due the Subcontractor. If no work has been performed by the Subcontractor, the Contractor reserves its right to pursue all legal means available to procure another subcontractor or self-perform the work and seek remedy from the Subcontractor for any costs incurred as a result of the subcontractor's failure to perform. If the Subcontractor so chooses, it may terminate the subcontract after the time period outlined in the cure notice has elapsed.

(Pl.'s Ex. 7). Plaintiff Richardson argues that Section VII is the sole remedy clause in the subcontract. He contends that because Defendant Mack never sent him a cure notice, Defendant Mack may not assess certain chargebacks against him, namely a pro rata portion of liquidated damages, the cost of Defendant Mack's Site Superintendent Willie Ferguson, and the cost of hiring another subcontractor MS Construction to tie rebar. With respect to the first two chargebacks, Brantley testified that she believed Defendant Mack's right to assess them against Plaintiff Richardson stems from Section I.7 of the subcontract, which provides, "To the extent included in the prime contract, all contract clauses are hereby incorporated by reference into the subcontract. A copy[1] of the prime contract or original solicitation will be provided to subcontractor." (Id.; Mar. 21 RT 50-51, 72-73). Brantley testified that the following Federal Acquisition Regulation (FAR) clauses are included in the prime contract and, therefore, incorporated into the subcontract:

> If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the

---

[1] Plaintiff Richardson testified that he did not receive a copy of the prime contract and that he also never asked for one even though he saw the provision in his subcontract incorporating by reference the terms of the prime contract. (Mar. 20 RT 41, 76). However, Ferraro testified that, in the ordinary course of business, he would have given Plaintiff Richardson a copy of the prime contract and so he was sure that Plaintiff Richardson received the prime contract. (Mar. 20 RT 145). The Court believes Ferraro as the more credible witness.

> amount of $62.00 for each calendar day of delay until the work is completed or accepted.

(Pl.'s Ex. 10, FAR 52.211-12(a)).

> At all times during performance of this contract and until the work is completed and accepted, the Contractor shall directly superintend the work or assign and have on the work a competent superintendent who is satisfactory to the Contracting Officer and has authority to act for the Contractor.

(Pl.'s Ex. 11, FAR 52.236-6).

Under both Tennessee and Missouri law, the aforementioned FAR clauses would be incorporated into the subcontract. See Lasco Inc. v. Inman Constr. Corp., 467 S.W.3d 467, 473 (Tenn. Ct. App. 2015) ("[W]ritings referred to in a written contract are incorporated by reference into the contract, and must be considered as part of the agreement of the parties."); Livers Bronze, Inc. v. Turner Const. Co., 264 S.W.3d 638, 643 (Mo. Ct. App. 2008) (internal quotation marks and citation omitted) ("[M]atters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in *haec verba*."). However, Plaintiff Richardson argues that incorporation by reference is suspect in Miller Act suits. See U.S. for Use & Benefit of Ken's Carpets Unlimited, Inc. v. Interstate Landscaping Co., 37 F.3d 1500 (6th Cir. 1994) (citing cases) ("Historically, courts have viewed incorporation by general reference with skepticism in Miller Act cases. . . . The Miller Act establishes specific statutory rights intended to protect subcontractors, and courts are reluctant to conclude that a subcontractor abandoned those rights absent language of specific incorporation.").

In Ken's Carpets, the Sixth Circuit[2] held that the general language "binding the subcontractor 'to assume toward the contractor all the obligations . . . the contractor assumes

---

[2] In a case decided prior to Ken's Carpets, the Sixth Circuit applied state law to allow incorporation by reference. See Kasler Electric, 1992 U.S. App. LEXIS at *8-9. In Kasler Electric, a provision in the subcontract bound the subcontractor to the prime contract's plans and specifications, which explicitly incorporated a regulation allowing the government to terminate performance when doing so was in its

7

toward the owner' [was not] specific enough to result in an incorporation by reference of the Davis-Bacon wage provision set out in the prime contract." Ken's Carpets, 37 F.3d at *5. Most of the cases that the Sixth Circuit cites in Ken's Carpets for the proposition that language of specific, rather than general, incorporation is necessary to bind a subcontractor deal with the incorporation of a disputes clause. Id. (citing H. W. Caldwell & Son, Inc. v. U. S. for Use & Benefit of John H. Moon & Sons, Inc., 407 F.2d 21, 23 (5th Cir. 1969) and U.S. for Use & Benefit of T/N Plumbing & Heating Co. v. Fryd Const. Corp., 423 F.2d 980, 983-84 (5th Cir. 1970)). Those cases held and reiterated that, in order for a disputes clause in a principal contract to be applicable to the subcontractor, the subcontract must contain a provision making it "expressly applicable." H. W. Caldwell, 407 F.2d at 23; Fryd Const. Corp., 423 F.2d at 983. The clear concern was not limiting a subcontractor's ability to sue under the Miller Act. See H. W. Caldwell, 407 F.2d at 23 ("We hold that ['a general incorporation by reference of the terms of the principal contract'] refers only to the quality and manner of the subcontractor's work, not the rights and remedies he may have against the prime contractor."); Fryd Const. Corp., 423 F.2d at 983 (holding the same).

Taken together, the above cases instruct that because Section I.7 of the subcontract is a general incorporation by reference of the terms of the prime contract, it incorporates the FAR clauses only if they refer to the quality and manner of Plaintiff Richardson's work. The Court finds that the FAR clause related to Defendant Mack's paying liquidated damages to the government is incorporated, but the clause related to Defendant Mack's maintaining a superintendent on site is not. With respect to the former, the Court has found, per its discussion *supra* in Section I.A., that Plaintiff Richardson contracted to complete the concrete work for the

---

interest. Id. Therefore, the Kasler Electric court held that the subcontract, too, contained a termination for convenience clause. Id. at 9.

reinforced bunker on February 17, 2012. He did not meet that deadline. The Court heard testimony from Brantley that others on the job could not work until Plaintiff Richardson had completed the concrete work. (Mar. 21 RT 51). Furthermore, Defendant Mack needed only about a week after Plaintiff Richardson finished to complete the construction project in its entirety. (Pl.'s Ex. 2, Ferguson's Production Reports). Because the liquidated damages FAR clause instructs the contractor to finish work in the specific time contracted to or pay liquidated damages, the Court finds it likewise imposes a requirement on the subcontractor to perform in a timely manner or pay. Brantley testified that Defendant Mack back charged Plaintiff Richardson only for the time he was delinquent in his performance, but absorbed other liquidated damages. (Mar. 21 RT 50-51). The Court finds Defendant Mack was within its right, per the prime contract and subcontract, to do that.

However, Defendant Mack may not back charge Plaintiff Richardson for the cost of maintaining Ferguson on site. The FAR Clause concerning superintendence says nothing about the cost of that superintendence passing from the contractor to the subcontractor if the subcontractor's tardiness leads to more days of work needing supervision. While the liquidated damages provision likewise says nothing about those charges passing from the contractor to the subcontractor, the Court finds that the liquidated damages provision lends itself to incorporation by general reference in a way that the supervision provision does not. That is to say, it is equitable for Plaintiff Richardson to bear the cost of liquidated damages for its *own* late performance, but not for Plaintiff Richardson to pay for the time of Defendant Mack's site supervisor when the subcontract does not specifically require it.

That Defendant Mack never sent a cure notice to Plaintiff Richardson does not defeat the liquidated damages chargeback. Section VII of the subcontract states that Defendant Mack "*may*

elect to send a cure notice." (Pl.'s Ex. 7) (emphasis added). Therefore, Defendant Mack was not required to do so. Furthermore, the Court credits the testimony of Brantley that she had conversations with Plaintiff Richardson expressing Defendant Mack's disappointment with the rate at which he worked. (Mar. 21 RT 35, 50). Her testimony is bolstered by an email that she sent to Plaintiff Richardson on January 24, 2012 stating, among other things, that "there has been very little progress on the site for about two weeks." (Def.'s Ex. 16). Given that Plaintiff Richardson contracted to complete the concrete work by February 17, 2012 and he was on notice that he was not making enough progress, the Court does not agree with Plaintiff Richardson that the lack of a cure notice eliminates any remedy for Defendant Mack under the subcontract.

**C. Plaintiff Richardson did not materially breach the subcontract in such a way to foreclose a recovery of damages under the subcontract**

Defendant Mack argues that Plaintiff Richardson may not recover damages under the subcontract, but may bring an action in *quantum meruit*, because he materially breached the subcontract. See Madden Phillips Const., Inc. v. GGAT Dev. Corp., 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009) (citing United Brake Sys., Inc. v. Am. Envtl. Prot., Inc., 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997) ("[A] party who commits the first uncured material breach of contract may not recover damages for the other party's material breach."); Guengerich v. Barker, 423 S.W.3d 331, 339 (Mo. Ct. App. 2014) (citation omitted) ("[A] party to a contract cannot claim its benefit where he is the first to materially breach it."); Pepsi Midamerica v. Harris, 232 S.W.3d 648, 654 (Mo. Ct. App. 2007) ("Appellant cannot recover on its claim of breach of contract because it did not substantially comply with the terms of the contract because of a material breach of the terms of the Agreement . . .").

Defendant Mack contends that Plaintiff Richardson materially breached the contract because, even though the subcontract imposed a "turn-key" obligation on Plaintiff Richardson

10

whereby he would "provide all labor, materials (rebar, concrete, etc.), disposal and necessary equipment specified on the contract drawings and specifications for all concrete work," (Pl.'s Ex. 7, Section I.2), he did not perform in that manner. Rather, Defendant Mack paid for concrete and rebar directly, and the Court heard testimony at the damages hearing from Ferraro and Ferguson that Defendant Mack had to supply tools, transport materials, and offload rebar. (Mar. 20 RT 112, 125, 142).

Under both Tennessee and Missouri law, courts use the following factors taken from the Restatement (Second) of Contracts, § 241 (1981) to determine whether a breach is material:

> (1) The extent to which the injured party will be deprived of the expected benefit of his contract;
> (2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
> (5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Adams TV of Memphis, Inc. v. ComCorp of Tennessee, Inc., 969 S.W.2d 917, 921 (Tenn. Ct. App. 1997); Barnett v. Davis, 335 S.W.3d 110, 114–15 (Mo. Ct. App. 2011). Defendant Mack argues that all of those factors are in its favor because 1) it was deprived the benefit of a turnkey contract by having to supply funds and materials and do administrative support work; 2) the strain and aggravation of having to supplement Plaintiff Richardson's performance cannot be recouped; 3) Plaintiff Richardson will not suffer forfeiture because he may proceed under *quantum meruit*; 4) Plaintiff Richardson would not have had time to cure because he did not adequately fund or staff his crew to ensure timely completion; and 5) Plaintiff Richardson did

not act in good faith by entering into a turnkey subcontract that he knew he could not perform as such.

Despite Defendant Mack's contentions, the Court finds that neither Plaintiff Richardson's failure to perform by February 17, 2012 nor his failure to perform the subcontract in a "turnkey" manner amounts to a material breach of the subcontract that precludes him from recovering damages under it. It is true that Defendant Mack did not obtain the benefit of a turnkey subcontract in that it had to assist Plaintiff Richardson throughout his performance of the concrete work. However, because the Court will allow Defendant Mack to make certain chargebacks against Plaintiff Richardson such that it recoups the funds it advanced to him through paying for supplies and equipment, Defendant Mack will be compensated. Furthermore, the Court is reluctant to find that Plaintiff Richardson may not recover under the subcontract when Defendant Mack continued to deal with Plaintiff Richardson and received the benefit of Plaintiff Richardson's work, ultimately having the reinforced bunker accepted and paid for by the Corps. See Madden Phillips Const., 315 S.W.3d at 813 ("A non-breaching party may nevertheless waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach.").[3]

---

[3] The Court does not hold that Defendant Mack waived its right to assert first material breach, but finds the principle of waiver instructive. Furthermore, the Court rejects Defendant Mack's assertion that it continued to deal with Plaintiff Richardson, paying for items Plaintiff Richardson was responsible for, only under duress. "Duress is defined as a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do and act or make a contract not of his own volition, but under such wrongful external pressure." Barnes v. Barnes, 193 S.W.3d 495, 500 (Tenn. 2006) (internal quotation marks and citation omitted); see also Andes v. Albano, 853 S.W.2d 936, 942 (Mo. 1993) (internal quotation marks and citation omitted) ("The central question with respect to duress is whether, considering all the surrounding circumstances, one party to the transaction was prevented from exercising his free will by the threats or wrongful conduct of the other."). Defendant Mack's witnesses did not testify about anything from which the Court could infer duress, not even Brantley's testimony that had Defendant Mack given Plaintiff Richardson a cure notice, he would have likely walked off the job given his temperament or Defendant Mack would have had to terminate him and find another subcontractor, which Defendant Mack contends was an unviable option. (Mar. 21 RT 50).

## II. Damages

"The Miller Act grants to the plaintiff the right to recover from the principal or surety, or both, for work and material supplied." U. S. for Use & Benefit of Statham Instruments, Inc. v. W. Cas. & Sur. Co., 359 F.2d 521, 524 (6th Cir. 1966). Plaintiff Richardson argues that he is due $54,308.42 under the subcontract, an amount he contends reflects both the disallowance of certain chargebacks and the addition of change orders that have increased the contract price. While Defendant Mack acknowledges that there is a remaining balance on the subcontract, it argues that even that baseline amount is not owed to Plaintiff Richardson because it should be allowed to subtract certain other expenditures from the balance. Those expenditures include amounts representing the administrative time of Defendant Mack's employees in resolving payroll issues and paying Plaintiff Richardson's suppliers, as well as the amount Defendant Mack incurred in attorney's fees when transferring this suit to Tennessee after Plaintiff Richardson initially filed this action in Missouri in breach of the subcontract's forum selection clause.

### A. Plaintiff Richardson's disputed chargebacks

Plaintiff Richardson disputes the following chargebacks, (Pl.'s Ex. 1, Disputed Chargebacks Tab 1):

|   | Description | Amount |
|---|---|---|
| 1 | Labor – Overtime for March 17, 2012 roof pour | $ 4,180.98 |
| 2 | Unistrut service | $ 973.80 |
| 3 | Unistruts purchased by Willie Ferguson | $ 292.83 |

| 4 | Diesel fuel purchased by Willie Ferguson | $ 256.95 |
| 5 | Eyebolts purchased by Willie Ferguson | $ 86.58 |
| 6 | RSC Scaffold | $ 1,479.94 |
| 7 | Grinder purchased from Lowe's | $ 123.73 |
| 8 | Miscellaneous expenses Willie Ferguson paid for | $ 389.05 |
| 9 | MS Construction rebar tying | $ 2,100.00 |
| 10 | Liquidated damages | $ 2,480.00 |
| 11 | Jeff Schneider's clean rock for stoops | $ 261.20 |
| 12 | Defendant Mack's Site Superintendent Willie Ferguson | $ 9,600.00 |
| | TOTAL: | $ 22,225.06[4] |

1. <u>Labor – OT for 3/17/12 Roof Pour</u>: Plaintiff Richardson argues that Defendant Mack never actually paid Plaintiff Richardson's crew $ 4,180.98 in overtime. He testified at the hearing that he could not find any payroll records showing that he paid any overtime that day. (Mar. 20 RT 16). Furthermore, Plaintiff Richardson argues that had it been paid, those overtime payments would have been a change order and not a chargeback. The record contains what appears to be notes from Defendant Mack for the "week ending 3-17-12" with a notation that says "MMI paying O/T for Crew." (Pl.'s Ex. 1, Tab 29). Ferraro testified at the hearing that he did not personally authorize any overtime. (Mar. 21 RT 7). However, Elizabeth Wilson, Defendant Mack's Assistant Controller who handles payroll, testified that Defendant Mack had to pay Plaintiff Richardson's employees directly the weekend of March 17, 2012 because Plaintiff Richardson could not or would not appear on site that weekend. (Mar. 21 RT 26). She testified that his workers were paid overtime because, having worked at the beginning of the week, they would not work unless they were paid at the overtime rate. (Mar. 21 RT 27). Defendant Mack submitted a copy of a certified payroll, (Def.'s Ex. 7), and copies of the workers' paystubs, (Def.'s Ex. 8). The Court finds this chargeback permissible, as authorizing overtime work does not mean Defendant Mack agreed to it as a change order. Furthermore, throughout the damages hearing, the Court found Plaintiff Richardson not to be very credible. Because the workers' paystubs indicate that Defendant Mack paid a total of $3,690.42 in overtime, the Court will allow only that amount to be assessed against Plaintiff Richardson.

---

[4] This number does not match the total as stated in Pl.'s Ex. 1 under Disputed Chargebacks Tab 1. It appears that Plaintiff Richardson miscalculated the number.

2. Unistrut Service: Plaintiff Richardson argues that Unistruts were a part of the timber installation and not the concrete work. However, Plaintiff Richardson testified that "if there's imbeds in concrete, that's part of the concrete work." (Mar. 20 RT 65). Ferguson testified that the Unistruts were for attaching the interior timbers, but were part of the concrete placement and had to be done by the concrete workers. (Mar. 20 RT 119). Ferraro testified likewise. (Mar. 20 RT 143). The Court finds this chargeback permissible. (Pl.'s Ex. 1, Disputed Chargebacks Tab 4 – invoice & receipt).

3. Unistruts Purchased: Because of the same testimony stated under "Unistrut Service," the Court finds this chargeback permissible. (Pl.'s Ex. 1, Disputed Chargebacks Tab 6 – invoice).

4. Diesel Fuel Purchased: Plaintiff Richardson argues that he never used diesel purchased by Ferguson. Furthermore, based on Plaintiff Richardson's testimony, it appears that he believes the diesel purchased was to fill up Ferguson's truck. (Mar. 20 RT 26). However, Ferguson testified that he did not purchase gas for his vehicle, but instead purchased the diesel fuel to power the forklift, which was used to offload rebar on site. (Mar. 20 RT 99, 104). Plaintiff Richardson's own testimony establishes that he was fully responsible for the rental of the forklift. (Mar. 20 RT 85). The Court finds that this chargeback is permissible. (Def.'s Ex. 5, Ferguson's cash sheets & receipts).

5. Eyebolts Purchased: Plaintiff Richardson argues that the eyebolts related to the timber installation. However, when asked if the eyebolts had to be affixed in the concrete, he responded, "if they did, I have to put them in there. But just like the windows, I didn't buy the windows, but I did place them." (Mar. 20 RT 64). Ferguson testified that the eyebolts were "to mount in the concrete or mount in the forms prior to placing the concrete," and that it goes with the concrete work. (Mar. 20 RT 100-101). Ferraro testified similarly. (Mar. 20 RT 143). The Court finds this chargeback permissible. (Pl.'s Ex. 1, Disputed Chargebacks Tab 7 – invoice).

6. RSC Scaffold: Plaintiff Richardson argues that he should only pay $1,000 out of the $2,479.94 price for the scaffold. He bases that figure on how much he thinks he used it. (Mar. 20 RT 20). Plaintiff Richardson testified that he did not need the scaffolding, and did not use it until his crew started forming the roof. (Mar. 20 RT 58). Ferguson testified that the scaffolding was used to set the rebar and mats in place. (Mar. 20 RT 110-111). Brantley further testified that as of the date of the invoice for the scaffolding charged back to Plaintiff Richardson, Defendant Mack had not yet done any timber work on site and had not arranged for the new set of scaffolding to do the timber work. (Mar. 21 RT 53). The Court credits the testimony of Brantley and Ferguson and finds the entire chargeback of $2,479.94 permissible. (Def.'s Ex. 15, invoice).

7. Grinder Purchased: Plaintiff Richardson testified that the grinder was given to his employees even though he said he did not need them and did not use them. (Mar. 20 RT 27). Ferguson testified that he purchased the grinder because some of Plaintiff Richardson's employees told him they did not have a grinder. (Mar. 20 RT 105). He further testified that he told them that he would get a grinder with seven zip wheels to cut

15

and mount the eyebolts and Unistruts. (Mar. 20 RT 105). He also testified that he told one of Plaintiff Richardson's workers to let Plaintiff Richardson know that he would purchase a grinder because it would be his. (Mar. 20 RT 112). The Court credits Ferguson's testimony and finds this chargeback permissible as a tool used in performing the concrete work. (Pl.'s Ex. 1, Disputed Chargebacks Tab 8 – invoice). Because the Court is allowing this chargeback, the Court will disregard Plaintiff Richardson's request to return the $18.85 that was refunded to him, which Ferguson testified might have been for unused zip wheels related to the grinder. (Mar. 20 RT 112).

8. Miscellaneous Expenses: Defendant Mack assessed a chargeback of $389.05 against Plaintiff Richardson for miscellaneous expenses. Defendant Mack does not specifically identify which expenses those are, but has submitted cash sheets with receipts attached. (Def.'s Ex. 5). As far as the Court discerns, those expenses include eyebolts and nuts for forms ($139.88 & $91.56) not already accounted for, drill bits for forms ($9.48), and foam spray for the Unistruts ($4.30 & $11.10). As testimony already referenced relates those materials to the concrete work, the Court finds the sum total of those items ($256.32) a permissible chargeback. Furthermore, the Court will allow the difference ($389.05 - $256.32) as a permissible chargeback because the total amount for diesel fuel, per the receipts submitted, is greater than the sum of that difference and item 4 above (diesel fuel). In other words, it is reasonable for the Court to assume that diesel fuel is also captured in these miscellaneous expenses.

9. MS Construction: Plaintiff Richardson argues that Defendant Mack is not allowed to charge him the cost of bringing on another crew to tie rebar because Defendant Mack never sent him a cure notice. Brantley testified that earlier on in the week before the March 17, 2012 pour, she and Ferraro spoke with Plaintiff Richardson about needing to increase labor in preparation for the pour, but Plaintiff Richardson said he would not support it. (Mar. 21 RT 36). She further testified that she told Plaintiff Richardson that Defendant Mack would bring in another subcontractor to help tie rebar and that he would be responsible to pay if he could not tie the rebar himself. (Mar. 21 RT 36). Plaintiff Richardson testified that he told Defendant Mack that he did not want or need any other subcontractor brought in and that he would not pay. (Mar. 20 RT 29). The Court finds that this chargeback is permissible. (Pl.'s Ex. 1, Disputed Chargebacks Tab 11 – invoice). Plaintiff Richardson contracted to take care of all aspects of the concrete work. Even though Defendant Mack never issued a cure notice (and it was not required to), it gave Plaintiff Richardson notice that it would bring on a new crew to assist. Furthermore, the Court heard testimony, including from Plaintiff Richardson himself, that there were fluctuations in his crew size throughout the construction project. (Mar. 20 RT 79-80, 144).

10. Liquidated Damages: Per the discussion above in Section I.B., the Court finds this to be a permissible chargeback. However, the amount will be slightly reduced. Ferguson testified that Plaintiff Richardson was off the site by March 23, 2012. (Mar. 20 RT 108). Therefore, the Court will allow liquidated damages to be assessed against Plaintiff Richardson from February 18, 2012 until March 23, 2012. That equals $2,170 ($62 x 35 days).

11. <u>Clean Rock for Stoops</u>: Plaintiff Richardson argues that this chargeback pertains to the excavation work and not the concrete work. The Court agrees. Based on the subcontract between Defendant Mack and its excavator Schneider and a document describing the scope of Schneider's work, the Court finds that this chargeback is impermissible. (Pl.'s Ex. 1, Disputed Chargebacks Tab 13).

12. <u>Site Superintendent</u>: Per the discussion above in Section I.B., the Court finds this an impermissible chargeback.

**B. Plaintiff Richardson's claimed change orders/ add ons**

Plaintiff Richardson argues that the following change orders increase the amount owed to him under the subcontract, (Pl.'s Ex. 1, Tab 1):

|   | Description | Amount |
|---|---|---|
| 1 | Formed Footing | $1,896.06 |
| 2 | March 3, 2012 Rhoebuild/Hot Water Exclusion | $1,055.00 |
| 3 | March 17, 2012 Rhoebuild/ Hot Water Exclusion & Saturday Delivery | $1,701.00 |
| 4 | Parker Welding | $500.00 |

1. <u>Formed Footing</u>: Plaintiff Richardson argues that he should not have to pay for forming material and labor because he made a notation on the contract as follows: "Bunker floor bid at bank pouring in ground. If it has to be formed it would be extra for labor and materials." (Pl.'s Ex. 7). Brantley agreed to that condition by initialing it. (Pl.'s Ex. 7). The $1,896.06 is comprised of extra material for the formed footing ($263.56), labor for setting the formed footing ($560.00), extra concrete for floor bunker ($855.00), and labor to unload rebar ($217.50). (Pl.'s Ex. 1, Tab 27). Plaintiff Richardson testified that he ran out of concrete when forming the footings. (Mar. 20 RT 56). He also testified that he had to place rebar in the footings. (Mar. 20

17

RT 57). Ferraro testified that as part of the specifications, there was a requirement to use forms and the government ultimately insisted that forms be used. (Mar. 20 RT 140). Because Brantley agreed to Plaintiff Richardson's condition, the Court finds this change order appropriate.

2. <u>March 3, 2012 Rhoebuild/Hot Water Exclusion</u>: Plaintiff Richardson argues that the Rhoebuild and hot water, which served the purpose of thinning out the concrete to allow it to pour easier, were items discussed with Defendant Mack at the making of the subcontract. (Mar. 20 RT 15). While the contract calls for a turnkey price for all labor and materials, it contains an exclusion for "cold weather mix up charge." (Pl.'s Ex. 7, Section I.2). When asked if it was a fair statement to say that Rhoebuild helped him work with the concrete, but was not a part of the cold weather mix up charge exclusion, Plaintiff Richardson testified that Rhoebuild is "an additive that had to be placed in the concrete in order to pour the bunker." (Mar. 20 RT 84). The Court will not allow recovery on this item. (Pl.'s Ex. 1, Tab 28).

3. <u>March 17, 2012 Rhoebuild/Hot Water Exclusion & Saturday Delivery</u>: Plaintiff Richardson argues that he discussed these items with Defendant Mack as change orders, and that he paid for them believing that Defendant Mack would reimburse him. (Mar. 20 RT 16-17). Ferraro testified that he did not recall agreeing to pay for a Saturday delivery from the concrete company. (Mar. 20 RT 144). The Court will not allow recovery on these items. (Pl.'s Ex. 1, Tab 30).

4. <u>Parker Welding</u>: Plaintiff Richardson testified that he did not remember exactly what he paid Parker Welding to weld on the roof, and he has not submitted a receipt for this expense. (Mar. 20 RT 18; Pl.'s Ex. 1, Tab 31). The Court will not allow recovery on this item.

C. **Defendant Mack's other expenditures**

The Court heard testimony concerning Plaintiff Richardson's having originally filed this suit in Missouri, in contravention of the subcontract's forum selection clause. The Court agrees that, as a result, Plaintiff Richardson should bear the cost of the attorney's fees Defendant Mack incurred when it transferred the suit to this Court. However, the Court will consider Defendant Mack's attorney's fees when it later rules on Plaintiff Richardson's pending Motion for Attorney Fees, (Docket No. 159).

The Court also heard testimony about the hours Wilson spent and the tasks she performed in dealing with payroll issues created by Plaintiff Richardson. Defendant Mack's witnesses further testified that they had to perform additional tasks because of Plaintiff Richardson, such as

having to spend time buying supplies and cleaning up the site after Plaintiff Richardson completed the concrete work. However, the Court will not allow Defendant Mack to offset the cost of its employees' time from the subcontract price. As the Court views it, this is part of the cost of doing business and nothing in the subcontract gives Defendant Mack that right.

### D. Total recovery due to Plaintiff Richardson

The amount of the original contract price and agreed upon change orders is $281,659.37. (Pl.'s Ex. 1, Tab 1 – lines 2-4). The parties do not dispute $231,503.01, an amount that represents undisputed chargebacks and payroll draws. (Pl.'s Ex. 1, Tab 1 – lines 5-25). That leaves $50,156.36 in dispute ($281,659.37 - $231,503.01). Per the Court's discussion in Section II.A, Defendant Mack rightfully assessed the following disputed chargebacks against Plaintiff Richardson: overtime for 3/17/12 Roof Pour ($3,690.42), Unistruts ($973.80 + $292.83), diesel fuel ($256.95), eyebolts ($86.58), scaffolding ($2,479.94), grinders ($123.73), miscellaneous expenses ($389.05), MS Construction ($2,100), and liquidated damages ($2,170) (total = $12,563.30). That brings the balance of the subcontract down to $37,593.06 ($50,156.36 - $12,563.30). Finally, per the Court's discussion in Section II.B, Plaintiff Richardson may add the costs related to formed footing ($1,896.06) to the subcontract. Plaintiff Richardson's total recovery, therefore, is $39,489.12.

## CONCLUSION

For the foregoing reasons, the Court will award Plaintiff Richardson $39,489.12 in damages under the subcontract. A separate order shall enter.

It is SO ORDERED.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE